**UNITED STATES of America,**
Plaintiff,

v.

.ANCHOR LINE, LTD., the Bristol City Line of Steamships, Ltd., Canadian Pacific Railway Co., the Cunard Steamship Co., Ltd., Furness, Withy & Co., Ltd., the Ulster Steamship Co., Ltd., (Head Line & Lord Line) and Manchester .Liners, Ltd., Defendants.

United States District Court
S. D. New York.
July 17, 1964.

Robert M. Morgenthau, U. S. Atty., and Louis E. Greco, New York City, for plaintiff; Gilbert S. Fleischer, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendants.

EDELSTEIN, District Judge.

This action was brought by the Government to recover penalties from the defendants, foreign shipping corporations, for alleged violations of Section 15 of the Shipping Act of 1916, 46 U.S. C.A. § 814.[1] Section 15, hereinafter referred to as § 814, requires "common carriers by water" to file immediately for approval with the Federal Maritime Board[2] copies of all "anti-competitive" agreements that fix rates or fares, allocate ports, establish working arrangements and the like, or, in general, control, regulate, prevent or destroy competition. See 39 Stat. 733, 46 U.S.C.A. § 814. The provisions of this section make it unlawful to carry out any non-competitive agreement that has not been thus filed, and the section further provides that whoever contravenes any of the provisions of this section shall be liable to a penalty of $1,000 for each day that such violation continues.

The defendants, it is alleged, are common carriers by water in the foreign commerce of the United States operating

---

1. 46 U.S.C.A. § 814. *"Contracts between carriers filed with Board.* Every common carrier by water, or other person subject to this chapter, shall file immediately with the Federal Maritime Board a true copy, or, if oral, a true and complete memorandum, of every agreement, with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term 'agreement' in this section includes understandings, conferences, and other arrangements. * * *"

\* \* \* \* \*

"Whoever violates any provision of this section shall be liable to a penalty of $1,000 for each day such violation continues, to be recovered by the United States in a civil action." Act amended Oct. 3, 1961, in a manner not pertinent to the instant motion. See Pub.L. 87–346, § 2, 75 Stat. 763.

2. On August 12, 1961, pursuant to Reorganization Plan No. 7 (§ 304, 26 Fed. Reg. 7315), the Federal Maritime Board's functions were transferred to the Federal Maritime Commission.

between the ports of the United Kingdom and the Great Lakes and St. Lawrence River ports in the United States and Canada. Acting on the complaint of competing lines, the Board held hearings and found that the defendant shipping companies had violated § 814 of the Act by entering into and carrying out agreements which effectuated the following: allocated ports and established joint working arrangements, fixed or regulated transportation rates in the trade between the United Kingdom and United States ports on the Great Lakes without filing immediately with the Board a "true copy" or "a true and complete memorandum" of such agreements. The Board entered an order, which was sustained on appeal, directing the defendants to desist from the violations found. See Anchor Line, Ltd. v. Federal Maritime Commission, 112 U.S.App.D.C. 40, 299 F.2d 124 (1962), cert. denied, 370 U.S. 922, 82 S.Ct. 1563, 8 L.Ed.2d 503 (1962). Thereupon, the matter was referred to the Department of Justice for appropriate action. A complaint was filed on June 7, 1962, and an amended complaint was subsequently filed on January 7, 1963.[3] The defendants, all of whom are foreign corporations, were served in the Southern District of New York, where they maintained offices for the transaction of business. Jurisdiction of the court to entertain the action is based on 28 U.S.C. § 1337 (1952).[4] Each of the defendants has entered a general appearance and has thereby conceded jurisdiction over its respective corporate person. What they have not conceded, however, is jurisdiction of this court over the subject matter of the action, see Fed.R.Civ.P. 12(b) (1), by reason of which they have moved to dismiss the complaint.

Defendants contend that inasmuch as § 814 does not grant jurisdiction over the subject matter of an action which, they urge, involves acts of foreign corporations committed outside the territorial jurisdiction of the United States, the complaint should be dismissed. In addition, they claim that the complaint is defective in any event because it fails to allege that (1) the agreements or arrangements were entered into in the United States, (2) that shippers in the United States were affected by any of the agreements or arrangements, and (3) that ports in the United States were affected thereby. In the alternative, those defendants who are not named in paragraphs Seventh, Eighth or Ninth of the complaint have moved to dismiss those paragraphs as against them.[5] But should Counts Seventh, Eighth or Ninth

---

3. The allegations of the amended complaint may be summarized as follows:
 Paragraph Sixth of the amended complaint alleges that all defendants entered an unapproved agreement fixing or regulating transportation rates in the trade from the United Kingdom to United States Great Lakes ports, notified shippers of the freight rates contained in a tariff jointly agreed upon pursuant to said agreement and quoted to shippers rates from said tariff. Paragraph Seventh alleges that all defendants, except Manchester, entered into and carried out an unfiled and unapproved agreement controlling, regulating and preventing competition; allocating ports; and restricting and otherwise regulating the number and character of sailings between ports. In paragraph Eighth, only Ulster, Anchor and Bristol are named in a similar unfiled and unapproved agreement. And paragraph Ninth alleges an unfiled and unapproved cooperative working arrangement between Canadian Pacific, Cunard and Furness.

4. 28 U.S.C. § 1337 provides: *"Commerce and anti-trust regulation.*
 "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies."

5. Defendant Manchester is not named in the Seventh paragraph; Canadian Pacific, Cunard, Furness and Manchester are not named in the Eighth paragraph; Anchor, Bristol, Ulster and Manchester are not named in the Ninth paragraph. As the claims in these paragraphs do not state claims against these defendants, they have moved to dismiss the claims against them.

**382**

not be dismissed, these defendants urge that "the counts contained in paragraphs Sixth, Seventh, Eighth and Ninth should be severed from one another," on the ground that "nothing in the amended complaint indicates that [these] four counts arise out of the same transaction, occurrence or series of transactions or occurrences" and that no "question of law or fact common to all defendants will arise in the action." [6] See Fed.R.Civ.P. 20(a), 21.[7] Finally, those defendants specifically named in paragraphs Sixth, Seventh, Eighth and Ninth move for a more definite statement of the allegations contained in those paragraphs. See Rule 12(e), Fed.R.Civ.P.

The broad sweep of the defendants' major contention is that § 814 is a statute of a quasi-penal nature and is sought to be applied extraterritorially so as to contravene the canon of statutory construction which dictates that an Act of Congress should be confined in its operation and effect to the territorial limits of the United States, unless a contrary intention is clearly and affirmatively expressed. See Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949); American Banana Co. v. United Fruit Co., 213 U.S. 347, 357, 29 S.Ct. 511, 53 L.Ed. 826 (1909). Beechwood Music Corp. v. Vee Jay Records, 328 F.2d 728 (2d Cir. 1964). Defendants' reliance on the canon of construction set forth above might be persuasive in an appropriate context. But an examination of § 814 reveals quite clearly that Congress intended that the statute reach the activities and operations of persons such as these foreign shipping companies

even beyond the territorial limits of the United States.

46 U.S.C.A. § 814 provides that its filing provisions apply to "[e]very common carrier by water, or other person subject to this chapter." Section 1 of the Act, the definitions section, 46 U.S. C.A. § 801, defines "common carrier by water" as a "common carrier by water in foreign commerce or a common carrier by water in interstate commerce on the high seas or the Great Lakes on regular routes from port to port." The definition of person "includes corporations, partnerships, and associations, existing under or authorized by the laws of the United States, or any State, Territory, District, or possession thereof, *or of any foreign country.*" (Emphasis supplied.) These definitions of the applicable terms of § 814 indicate a quite unmistakable and unequivocal Congressional intention that the filing and penalty provisions of § 814 were intended to apply extraterritorially to these defendant shipping companies. But the court's determination that the Statute, § 814, may be given extraterritorial effect does not resolve the real issue posed by the parties' contentions because the dispositive issue does not involve the extraterritorial application of § 814 to conduct abroad. The real issue is: May a United States statute be applied to the alleged conduct of British corporations when that conduct was devised abroad but was effectuated within the United States and allegedly had affect here? Judicial construction of related sections of the Shipping Act as well as a canvass of the relevant cases indicates that § 814 is ap-

---

6. See Defendants' Memorandum of Law, pp. 14, 16.

7. Rule 20(a) Fed.R.Civ.P., dealing with Permissive Joinder of Parties, provides, in pertinent part:

"All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question

of law or fact common to all of them will arise in the action. * * *"

Rule 21, Fed.R.Civ.P. provides:

MISJOINDER AND NON-JOINDER OF PARTIES

"Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately."

plicable to these defendants. See Montship Lines, Ltd. v. Federal Maritime Board, 111 U.S.App.D.C. 160, 295 F.2d 147 (1961).

In Kerr Steamship Co. v. United States, 284 F.2d 61 (2d Cir. 1960), the court was concerned with § 21 of the Act, 46 U.S.C.A. § 820 [8] which requires every common carrier by water to file a list identifying in detail every contract made with any other common carrier by water, freight forwarder, terminal operator, stevedore, or ship's agent, if such contract involved the waterborne commerce of the United States. In overruling the objection raised by foreign carriers that the contracts should not be produced since they were located outside the United States, Judge Learned Hand stated:

"The investigation was to acquaint the Board with what were the practices of carriers engaged in commerce with the United States, and it was essential to that purpose to know what took place outside the United States as well as inside. *Nobody would argue, we should suppose, that oral agreements made in other countries could have no effect upon the commerce of the United States, which was the subject being investigated.*" Id. at 64. (Emphasis supplied.)

And the Court of Appeals for the District of Columbia, in considering the jurisdictional reach of the Shipping Act, stated in the Montship case that "In enacting the Shipping Act, which deals with foreign as well as interstate commerce, Congress was clearly mindful of the fact that foreign flag as well as United States carriers were subject to regulation thereunder. See H.R.Rep.No. 659, 64th Cong. 1st Sess. (1916)." Montship Lines, Ltd. v. Federal Maritime Board, supra 295 F.2d at 154.

The vital principle to be applied in determining whether the United States courts have jurisdiction over foreign-flag carriers who fail to file contracts entered into abroad is whether the performance of those contracts or effectuation of those arrangements operated in this country so as to affect our foreign commerce directly and materially. See United States v. Aluminum Co. of America, 148 F.2d 416, 443–444 (2d Cir. 1945). This principle was explicitly and clearly enunciated in United States v. Hamburg-Amerikanische P. F. A. Gesellschaft, 200 F. 806 (S.D.N.Y.1911), which involved a contract between foreign steamship companies which were doing business in United States ports pursuant to a contract with an American company for division of steerage passenger traffic and the pooling of receipts. In overruling demurrers to a complaint seeking an injunction to restrain an alleged violation of the Sherman Act, the court said:

"As the contract directly and materially affects the foreign commerce of this country by being put into effect here, it is immaterial where it was entered into or by what vessels it was to be, or has been, performed. Citizens of foreign countries are not free to restrain or monopolize the foreign commerce of this country by entering into combinations abroad nor by employing foreign vessels to effect their purpose. Such combinations are to be tested by the same standard as similar combinations entered into here by citizens of this country. The vital question in all cases is the same: Is the combination to so operate in this country as to directly and materially affect our foreign commerce?" Id. at 807.

---

8. 46 U.S.C.A. § 820. *Reports by carriers required.*

"The Federal Maritime Board and the Secretary of Commerce may require any common carrier by water, or other persons subject to this chapter, or any officer, receiver, trustee, lessee, agent, or employee thereof, to file with it or him any periodical or special report, or any account, record, rate, or charge, or any memorandum of any facts and transactions appertaining to the business of such carrier or other person subject to this chapter. * * * "

The same principle was applied in Thomsen v. Cayser, 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597 (1917); United States v. Pacific & Arctic Ry. & Nav. Co., 228 U.S. 87, 33 S.Ct. 443, 57 L.Ed. 742 (1913); United States v. Sisal Sales Corp., 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927); United States v. Nord Deutscher Lloyd, 223 U.S. 512, 32 S.Ct. 244, 56 L.Ed. 531 (1927). (Illegal combinations, contracts or wrongful acts entered into or committed abroad having operative effects here.) See United States v. Aluminum Co. of America, supra; Restatement, the Foreign Relations Law of the United States, § 38 (Proposed Official Draft, May 3, 1962); But see Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633 (2d Cir. 1956), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956). (Lanham Trademark Act held not to reach trademark infringement by an alien in Canada that had adverse economic effects on the plaintiff in the United States.)

The defendants, relying on Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) and McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed. 2d 547 (1963), urge that they stand opposed to the principle of the above-cited cases. They claim that these cases stand for the proposition that "any Act of Congress * * * will ordinarily be confined in its operation and effect to the territorial limits of the United States. * * *" But the cases from which this principle was distilled presented an entirely different question for resolution—whether a statute of the United States may be applied to regulate the *internal* activities of a foreign nation. Lauritzen involved a suit for personal injuries sustained by a foreign citizen seaman on a foreign-flag ship while in foreign waters. The Supreme Court could "find no justification for interpreting the Jones Act to intervene between foreigners and their own law because of acts on a foreign ship not in our waters." Id., 345 U.S. at 593, 73 S.Ct. at 933. And in Hondurena the Su-

preme Court refused jurisdiction to the National Labor Relations Board to conduct union representation elections for alien seamen aboard a foreign-flag vessel berthed in our ports. In the Court of Appeals opinion, sub. nom., Empresa Hondurena de Vapores, S. A. v. McLeod, 300 F.2d 222, 235 (2d Cir. 1962), Judge Friendly noted that to extend the regulatory jurisdiction of the National Labor Relations Board to conduct in Honduras, where the bargaining between Empresa and its employees took place, would be in effect to force the will of the National Labor Relations Board on matters that dealt only with internal affairs in Honduras. Judge Friendly took note of the Shipping Act cases such as Kerr S. S., supra, and Montship Lines, supra, and pointed up the significant distinction between what was attempted to be done in Hondurena and what the Government attempted to accomplish in the Kerr and Montship Lines cases, in particular, and in the Shipping Act, 46 U.S.C.A. § 820, in general:

"The situation here differs sharply from the United States' informing itself as to contracts relating to the movement of traffic between the United States and a foreign country, Kerr S. S. Co. v. United States, 284 F.2d 61 (2d Cir. 1960); Montship Lines, Ltd. v. Federal Maritime Board [111 U.S.App.D.C. 160], 295 F.2d 147, 153 (D.C.Cir. 1961), or even taking action with respect thereto, Thomsen v. Cayser, 243 U.S. 66 [37 S.Ct. 353, 61 L.Ed. 597] * * * (1917)."

Clearly, the Lauritzen and the Hondurena cases are inapposite.

 In its determination of defendants' motion to dismiss the complaint, the court must construe the allegations in a manner most favorable to the pleader. 2 Moore, Federal Practice ¶12.08 at 2245 (2d ed. 1962). Applying this principle, together with the canon that a complaint should not be dismissed unless it appears to a certainty that under no set of facts proven at trial would the pleader be entitled to relief, see Con-

ley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Arthur H. Richland Co. v. Harper, 302 F.2d 324 (5th Cir. 1962), it is patent that defendants' motions must be denied. Although the Government has not alleged *in haec verba* that performance of the contracts had "affect" here, the pertinent allegations of the amended complaint, nevertheless, specifically refer to the commerce "from the United Kingdom to United States Great Lakes ports." Clearly the defendants' alleged activities in the Great Lakes trade, if proved at trial, could be held to have had an operative effect on the foreign commerce of the United States, thereby subjecting defendants, who acted pursuant to unfiled arrangements and agreements, to the regulatory provisions of § 814.

In advance of oral argument on defendants' motions, Government counsel handed up to the court a document entitled "Aide Memoire" dated September 10, 1962, which had been prepared by the British Embassy in Washington, D. C. The Aide Memoire protested these proceedings against six private British and Canadian shipping companies for violations of the Shipping Act of 1916, as amended. The British Embassy's Shipping Attache requested the State Department to bring the Aide Memoire to the court's attention, and the Department of Justice, at the State Department's request, transmitted the document to the court without comment. The contents of the Aide Memoire clearly identify it as merely a "letter of protest" by the British Government to the Executive Branch of our Government, noting its displeasure at the action taken by the Federal Maritime Board against private British shipping companies, and its disapproval of the present action for the collection of penalties from these companies. This document is barren of any suggestion whatever that either the Federal Maritime Board's rulings or the prosecution of the penalty action involves the British Sovereign in any way. Nor is there any contention made that the British shipping companies involved are British Government instrumentalities. Significantly, the British note did not request that the State Department intervene in the action.

Defendants have urged that the court is bound to respect a diplomatic note from the British Government and must accord significant weight to such a claim of immunity. But there is no issue of immunity involved in this case. In cases involving sovereign immunity, our courts will generally follow the suggestion of the Attorney General of the United States and grant immunity to the foreign sovereign if its claim is recognized and allowed by the Executive Branch of the Government. National City Bank of New York v. Republic of China, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955); Republic of Mexico v. Hoffman, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945); Compania Espanola de Navegacion Maritima, S. A. v. The Navemar, 303 U.S. 68, 58 S.Ct. 432, 82 L.Ed. 667 (1938). However, no claim of sovereign immunity has been made in this suit. Since the Aide Memoire was submitted to the court solely as a matter of comity, it has no legal or binding effect. Lamont v. Travelers Insurance Co., 281 N.Y. 362, 24 N.E.2d 81 (1939). Actually, the Aide Memoire submitted by the British Government here is more properly a communication to be dealt with by the Executive Branch rather than by the Judiciary. Unless the Executive Branch takes a position before the court in support of a foreign government's protest, not much weight will be given to it by our courts. This principle was aptly expressed in Montship Lines, Ltd. v. Federal Maritime Board, supra, 295 F.2d at 154, where the court stated: "We must reject petitioners' contentions regarding protests of foreign governments and extra-territorial enforcement of the Board's order. As the Second Circuit pointed out in Kerr [Kerr S. S. Co. v. United States, 284 F.2d 61 (2d Cir. 1960)], the protests of foreign governments are matters for consideration by the Executive and not the courts."

■■ Defendants' motions pursuant to Rule 12(e) and Rule 21 Fed.R.Civ.P. for a more definite statement of the complaint and for severance of certain of the claims against Canadian Pacific, Cunard and Furness are without substance. The motion is clearly without merit because the complaint is not so "vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." The complaint fairly gives notice of the Government's claim for penalties under the Shipping Act of 1915 and is adequate to apprise the defendants of the nature of the action that they are required to defend. See Hayes v. Bill Haley and His Comets, Inc., 32 F.R.D. 323 (E.D.Pa. 1963); Lincoln Laboratories, Inc. v. Savage Laboratories, Inc., 26 F.R.D. 141 (D.Del. 1960); Sanitized, Inc. v. S. C. Johnson & Sons, 23 F.R.D. 230 (S.D.N.Y. 1959). Defendants' motion must also be denied because it seeks evidentiary matter which should be sought by means of the deposition and discovery procedures. Cmax, Inc. v. Hall, 290 F.2d 736 (9th Cir. 1961).[9]

■ And defendants' motion pursuant to Rule 21 Fed.R.Civ.P. requesting a severance of the claims set forth in paragraphs 7 and 9 is totally without substance. The unlawful agreements asserted in paragraphs 6, 7, 8, and 9 of the amended complaint are alleged to have taken place within one year of each other and are alleged to have occurred in the Great Lakes shipping trade. The agreements were proven before the Federal Maritime Board in a single record by the same witnesses and to a great extent the proof of the violations by the defendants are subject to overlapping documentary proof. See Federal Maritime Board Report, 6 F.M.B. 196 (1961).

■ Joinder of causes of action under Rule 18 Fed.R.Civ.P. is encouraged as long as the requirement of Rule 20 Fed.R.Civ.P. is fulfilled: i. e., "whether the claims arise out of the same transaction, occurrence, or series of transactions or occurrences," and a common question of law or fact is involved. See 3 Moore, Federal Practice, ¶20.06 (2d ed. 1963); Nagler v. Admiral Corp., 248 F.2d 319 (2d Cir. 1957). These requirements are satisfied where, as here, the complaint alleges concerted activity by the defendants to enter into agreements and undertakings which, it is claimed, have violated the Act. Severance of these claims would lead to delay, inconvenience and added expense, results which Rule 20 seeks to prevent.

And last—and least—are the claims of certain of the defendants seeking dismissal of the paragraphs of the complaint in which they are not named. There is no need for an order to dismiss those paragraphs since the complaint seeks relief only for activities in which they allegedly were engaged. Accordingly, all of the defendants' motions are denied.

So ordered.

---

9. Typical of the items sought by the motions for a more definite statement are the following requests:

\* \* \* \* \*

"(b) the dates between which said agreement is alleged to have been carried out.

\* \* \* \* \*

"(e) the substance of said agreement.

"(f) the nature of the competition controlled, regulated and prevented.

"(g) the places or ports between which said competition was controlled, regulated or prevented.

"(h) the dates between which said competition was controlled, regulated or prevented.

"(i) the commodities concerning which said competition was controlled, regulated or prevented.

"(j) the parties between whom said controlled, regulated or prevented competition existed.

"(k) the manner in which said competition was controlled, regulated or prevented."